IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:06-HC-2032-D

| | |
|---|---|
| JOHNNY WAYNE HYDE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )      **ORDER** |
| | ) |
| GERALD BRANKER, Warden, | ) |
| Central Prison | ) |
| Raleigh, North Carolina,[1] | ) |
| | ) |
| Respondent. | ) |

Johnny Wayne Hyde ("petitioner"), was sentenced to death for the first-degree murder of

Leslie Egbert Howard. In August 1996, Hyde, James Blake, and Joel Coleman killed Leslie Howard

after breaking into his home to steal drugs. Hyde seeks a writ of habeas corpus vacating his first-

degree murder conviction or alternatively, his death sentence. The parties filed cross-motions for

summary judgment [D.E. 9, 14]. As explained below, the court grants respondent's motion for

summary judgment and denies petitioner's motion for summary judgment.

I.

The following facts are summarized from the North Carolina Supreme Court's opinion

affirming Hyde's convictions and sentence. See State v. Hyde, 352 N.C. 37, 530 S.E.2d 281 (2000).

On the night of August 1, 1996, petitioner was drinking at a shed next to his house with James Blake

and Joel Coleman. Blake and Coleman started talking about where they could get more drugs and

decided to rob Leslie Howard because he was known to have drugs in his mobile home and was

---

[1] Marvin Polk, former Warden of Central Prison, was named as respondent in the petition.
Since the petition was filed, Gerald Branker has replaced Polk as Warden and will be substituted as
the respondent. See Fed. R. Civ. P. 25(d).

always alone. Sometime after midnight, they asked petitioner to help them break into Howard's home to steal "weed" and he agreed. They gathered items from petitioner's shed. Petitioner took a knife, hand saw, and drill bit. Blake carried an ax head and a pipe. The men walked to Howard's mobile home and Blake pried open the front door with the ax head. Petitioner led the men down the hallway to Howard's bedroom. Howard was sitting up in the bed and lunged at petitioner. Petitioner stabbed Howard several times with the knife. When Howard fell to his knees, Blake or Coleman hit him in the back of the head with the pipe. Howard fell onto the floor and petitioner stabbed him in the side and back with the drill bit. Petitioner started to cut Howard's throat with the hand saw, but became nauseated. Coleman took over cutting Howard's throat, and Blake went into the living room to keep a lookout. When a car approached, petitioner, Blake, and Coleman ran from the scene and went back to petitioner's shed. Blake burned the weapons in a barrel to "burn off the blood" and put them in a trash can to be picked up the next day. When petitioner went home, his sister noticed he was covered in blood. She asked what happened and he told her that he thought he, Blake, and Coleman had killed Howard. She helped him wash his clothes and they got rid of all of the blood except for a small spot on his t-shirt.

On August 2, 1996, Howard's father discovered his son's body in the mobile home. An emergency medical technician determined the cause of death was a combination of multiple stab wounds to the chest and abdomen, blunt trauma to the head, and massive lacerations to the neck. Id. at 41-42, 530 S.E.2d at 285-86.

On November 1, 1996, acting on information from petitioner's ex-girlfriend, the police questioned petitioner about Howard's death. At the time, petitioner was in jail serving a sentence on unrelated charges. Petitioner initially denied any involvement in the murder, but subsequently made a statement admitting what he, Blake, and Coleman had done. Id. at 43-44, 530 S.E.2d at 287.

II.

Hyde was indicted for first-degree murder, first-degree burglary, robbery with a dangerous weapon, and conspiracy to commit first-degree burglary. After trial by jury at the July 6, 1998, criminal session of the Superior Court of Onslow County, Hyde was found guilty of first-degree murder, first-degree burglary, and conspiracy to commit first-degree burglary.[2] He was found not guilty of robbery with a dangerous weapon. Petitioner did not testify at either phase of trial and the defense did not present any evidence at the guilt phase. At the sentencing phase, the defense presented mitigating evidence focusing on petitioner's intoxication at the time of the crime, his history of substance abuse, and his dysfunctional family and upbringing. At the sentencing phase, the jury found all three of the aggravating circumstances submitted with respect to the first-degree murder conviction: that the murder was committed for the purpose of avoiding a lawful arrest; that the murder was committed while the defendant was engaged in the commission of a first-degree burglary; and that the murder was especially heinous, atrocious, or cruel. State Ct. R., Vol. 12 of 15, Ex. D at 112. The jury also found 5 statutory and 24 non-statutory mitigating factors. Id. at 113-22. The jury returned a verdict of death. Id. at 124. The court sentenced petitioner to death and also sentenced him to 77 to 102 months imprisonment on the first-degree burglary conviction and 29 to 44 months imprisonment on the conspiracy to commit first-degree burglary conviction. Id. at 128-31. The sentences run consecutively.

On direct appeal the North Carolina Supreme Court affirmed petitioner's convictions and sentences. Hyde, 352 N.C. at 61, 530 S.E.2d at 297. The United States Supreme Court denied certiorari. Hyde v. North Carolina, 531 U.S. 1114 (2001). Hyde filed a motion for appropriate

---

[2] He was found guilty of first-degree murder on the basis of premeditation and deliberation and also on the basis of felony murder. See State Ct. R., Vol. 12 of 15, Tab D at 108.

relief ("MAR") in Onslow County Superior Court on September 6, 2001. The MAR court held an

evidentiary hearing on the claim of ineffective assistance of counsel.[3] On May 16, 2005, the MAR

court entered an order (the "MAR Order") denying petitioner's MAR.[4] Hyde petitioned the North

Carolina Supreme Court for review. The court denied review on November 3, 2005. State v. Hyde,

360 N.C. 72, 623 S.E.2d 779 (2005).

On March 8, 2006, Hyde filed his petition for writ of habeas corpus with this court. After

an initial review of the petition pursuant to Rule 4 of the Rules Governing Section 2254 Cases, the

court directed respondent to file a response. On May 11, 2006, respondent filed an answer and

thereafter he filed a motion for summary judgment. On June 26, 2006, petitioner filed a response

and cross-motion for summary judgment.

III.

Summary judgment is appropriate when there exists no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247 (1986). The court's review of the claims is governed by 28 U.S.C.

§ 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

Pub. L. No. 104-132, 110 Stat. 1214 (1996). Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or

---

[3] The transcript of the hearing is located in the State Ct. R., Vol. 14 of 15, Tab G.

[4] The order is located in the App. to Pet., Vol. 1 of 1, Tab 24.

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States'... refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

If a petitioner establishes the state court's adjudication of his claims was "contrary to" or an "unreasonable application of" clearly established federal law, or was "based on an unreasonable determination of the facts in light of the evidence," then a federal court may proceed to review a state court judgment independently to determine whether habeas relief is warranted. See Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an

unreasonable application of, clearly established federal law. See Bell v. Jarvis, 236 F.3d 149, 158

(4th Cir. 2000) (en banc). Finally, the factual findings of the state court are presumed to be correct.

28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting this presumption by clear and

convincing evidence. Id.

IV.

In the petition, Hyde argues he is entitled to habeas relief vacating his convictions and death

sentence because of the following errors:

> Claim I - The trial court erred by denying the motion to suppress petitioner's statement to the
> police;
>
> Claim II - The trial court erred by excusing prospective jurors before calling the case for trial;
>
> Claim III - The trial court erred by sustaining the State's objections to questions during voir
> dire about whether prospective jurors would automatically return the death penalty;
>
> Claim IV - The trial court erred by submitting an aggravating circumstance to the jury that
> was not supported by the evidence;
>
> Claim V - The trial court erred by not intervening when the prosecutor made an improper
> closing argument;
>
> Claim VI - The trial court erred by denying petitioner's requested jury instructions and by
> giving an inadequate instruction on statutory mitigating factors;
>
> Claim VII - Ineffective assistance of counsel because trial counsel failed to raise voluntary
> intoxication as a defense at the guilt phase and failed to adequately prepare the experts
> presented at the sentencing phase.

Respondent concedes that Hyde has exhausted his state-court remedies as to each of these

claims as required by 28 U.S.C. § 2254(b). See Answer to Pet. ¶ 1(b).

V.

A.

In Claim I, petitioner argues that the trial court violated his constitutional rights by denying

his motion to suppress the statement he made to the police. Petitioner first raised this claim on

6

direct appeal. He argued his statement should be suppressed because it was improperly obtained through promises and threats. The North Carolina Supreme Court rejected the claim on the merits. Hyde, 352 N.C. at 45, 530 S.E.2d at 288.

Statements taken from an individual during custodial interrogation must be suppressed unless the police inform the individual of his Miranda rights and he validly waives those rights. See Miranda v. Arizona, 384 U.S. 436, 479 (1966). Whether an individual has validly waived his rights depends upon two factors: whether the waiver was voluntary and whether the waiver was knowing. North Carolina v. Butler, 441 U.S. 369, 373 (1979). A voluntary waiver is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). "The existence of a threat or an implied promise does not automatically render a confession involuntary." United States v. Braxton, 112 F.3d 777, 783 (4th Cir. 1997) (en banc). Rather, a court must consider whether the defendant's will "has been overborne and his capacity for self-determination critically impaired." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973) (quotation omitted). A knowing waiver is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Burbine, 475 U.S. at 421. An express waiver is not required. Butler, 441 U.S. at 373. A voluntary and knowing waiver may be "inferred from the actions and words of the person interrogated." Id. In determining whether a waiver was voluntary and knowing, a court must consider the totality of the circumstances surrounding the interrogation. See Burbine, 475 U.S. at 421; Braxton, 112 F.3d at 781-83.

The trial court held a hearing on petitioner's motion to suppress on June 1, 1998.[5] At the conclusion of the hearing, the court made findings of fact and denied the motion from the bench.

---

[5] The transcript of the hearing on the motion to suppress is located in the State Ct. R., Vol. 1 of 15, Tab A.

Case 5:06-hc-02032-D   Document 16   Filed 09/25/07   Page 7 of 46

See State Ct. R., Vol. 1 of 15, Tab A at 168-72. In treating this claim on direct review, the North

Carolina Supreme Court summarized the trial court's findings of fact:

> On 1 November 1996 at 3:30 p.m. in an interview room of the Onslow County Sheriff's Department, Detective Condry advised defendant of his rights. Defendant waived his rights orally and in writing. Defendant remained in the locked interview room for approximately one hour while Detective Condry was interviewing another suspect. Defendant knocked on the door in order to go to the rest room, and Captain Bryan escorted defendant to the rest room and gave defendant access to a water fountain. While waiting back at the interview room, Captain Bryan told defendant that "if the defendant was asked any questions, it would be best if the defendant told the truth because the truth would come out anyway and it would take a load off of him." Captain Bryan never made any promises or threatened defendant.
>
> Detective Condry moved defendant from the interview room down the hallway to the conference room. Before starting the examination, Detective Condry readvised defendant of his rights; and defendant agreed to talk with the officers. Defendant appeared coherent and did not appear to be impaired from alcohol or drugs. After initially denying any involvement in the murder, defendant admitted his participation in the murder. During the questioning, neither Detective Condry nor Sheriff Brown made any promises, threats, or suggestions of violence to defendant in order to induce him to make a statement.

Hyde, 352 N.C. at 43-44, 530 S.E.2d at 287. The North Carolina Supreme Court, relying upon the

state standard, noted that findings of fact made by a trial judge with respect to the voluntary nature

of a confession are conclusive on the reviewing court if supported by competent evidence. Id. at

44, 530 S.E.2d at 287. The North Carolina Supreme Court concluded that the trial court's findings

were "amply supported by competent evidence in the record" and held that the trial court did not err

by denying the motion to suppress. Id. at 45, 530 S.E.2d at 288.

In his petition, petitioner summarizes evidence from the hearing on the motion to suppress.

He notes that the record reflects he had an eighth grade education and he was placed in an interview

room for an hour before being questioned. He states that he testified at the hearing that one of the

officers interrogating him told him "that if I made a statement and cooperated that they would – I

believe he said testify, but I know he said testify or tell the D.A. that I cooperated and that they

would take it lighter on me." Pet. at 17 (citing State Ct. R., Vol. 1 of 15, Tab A at 125). He testified that he read the rights waiver form, but it was not read to him. He notes that a police witness testified it was read out loud to petitioner. Petitioner also states that Captain Bryan was called on rebuttal and testified that while petitioner was waiting in the small interrogation room he had taken petitioner to the restroom and spoken with him. Captain Bryan said he told petitioner to "be honest because the truth would come out." Id. at 18 (citing State Ct. R., Vol. 1 of 15, Tab A at 164). After citing the above-referenced testimony, petitioner argues that the state court's ruling was unreasonable. In response to respondent's motion for summary judgment, petitioner states that the question before the court is "whether the record as a whole reasonably supports the state court findings and conclusions that Petitioner's waiver of rights was knowing and intelligent, and that his statement was voluntary." Cross-Mot. & Resp. at 10.

Petitioner has failed to show that the ruling of the North Carolina Supreme Court is either based upon an unreasonable determination of the facts or based upon an unreasonable application of clearly established federal law. First, insofar as petitioner is challenging the factual findings of the North Carolina Supreme Court, this court rejects the argument. Absent clear and convincing evidence to the contrary, the factual findings of the state court are presumed correct. 28 U.S.C. § 2254(e)(1). Petitioner has not presented clear and convincing evidence to rebut the state court's factual findings. Petitioner testified at the hearing that the Miranda rights were never read to him and he was first given the rights to read in the large conference room. State Ct. R., Vol. 1 of 15, Tab A at 11, 121. However, in direct contradiction to petitioner's claim, Detective Condry testified that he brought petitioner from his jail cell and placed him in a small interview room. Once in the small interview room, Condry read petitioner his Miranda rights. Id. at 12, 159. Condry testified he then left petitioner for approximately one hour to interview another witness, and upon returning he moved

9

petitioner to a large conference room to interview him with another officer, Sheriff Brown. Id. at 21, 23, 63. Both Detective Condry and Sheriff Brown testified that before any questioning began in the large conference room petitioner again was read his <u>Miranda</u> rights. Id. at 23, 95.[6]

Petitioner also has not shown that the state court made an unreasonable determination of the facts in finding that he was not promised anything in exchange for his statement. Petitioner testified at the hearing on the motion to suppress that Detective Condry told him he would testify on his behalf or tell the D.A. that petitioner cooperated and they would take it lighter on him. Id. at 125. However, both Detective Condry and Sheriff Brown testified that they did not promise petitioner anything and he was not coerced or threatened into making his statement or waiving his rights. Id. at 18, 27, 44, 95-96. On rebuttal, Detective Condry directly disputed petitioner's account. Id. at 159. Detective Condry testified that he never told petitioner that if he told the truth he would talk to the D.A. or testify on his behalf. He said that he never promised to help petitioner and never said that things would go easier if he made a statement. Id.[7]

Similarly, the trial court's finding that Detective Bryan did not make any promises or threats, see id. at 173, is supported by the record, including petitioner's testimony. Bryan testified that after

---

[6] Even accepting petitioner's version, he failed to show the <u>Miranda</u> warnings were not effectively given. Petitioner concedes he read a <u>Miranda</u> rights form in the large conference room before giving his statement. State Ct. R., Vol. 1 of 15, Tab A at 121, 142. The police are not required to give the warnings orally to comply with <u>Miranda</u>. <u>See, e.g.</u>, <u>United States v. Sledge</u>, 546 F.2d 1120, 1122 (4th Cir. 1977) (per curiam). Petitioner was not asked any questions in the small interview room and does not contend he did not understand the form when he read it to himself and signed the waiver.

[7] Even if petitioner could show Detective Condry said he would speak to the D.A., that statement would not demonstrate petitioner was improperly induced to make his confession. <u>See, e.g.</u>, <u>United States v. Pelton</u>, 835 F.2d 1067, 1073 (4th Cir. 1987) (finding officer's indication he would make cooperation known did not make statement involuntary); <u>accord</u> <u>United States v. Mizyed</u>, 927 F.2d 979, 982 (7th Cir. 1991) (finding promise to make cooperation known to prosecutor did not invalidate waiver).

he allowed petitioner to use the restroom he told petitioner, "whenever the officers came to talk to him if he had any knowledge about what they were talking to him about it would be best if he told them the truth because the truth would ultimately come out." Id. at 163. He said he may have also told petitioner "it would take a load off of his shoulders if he would be honest because the truth would come out." Id. at 164. Petitioner testified that Bryan did not ask him any questions and did not make any promises or threats, but only spoke of having a conscience and told petitioner that people felt better when they did not keep things bottled up. Id. at 145-47.

Given these facts, petitioner has not shown that the North Carolina Supreme Court acted contrary to clearly established federal law in finding that his waiver was knowingly and voluntarily made. As the state court found, the officers did not make any threats or promises and petitioner was not coerced or induced in any manner. There also is no evidence that petitioner was mistreated. He waited in the first interview room for just under one hour before he was questioned and during that time he was taken to the bathroom at his request. Id. at 21, 116. The questioning in the large conference room lasted approximately two hours. Id. at 69. During that time, petitioner's handcuffs were removed and he was told to let the officers know if he needed a drink or to use the bathroom. Id. at 120, 70. Nothing in the record supports a finding that his statements were not voluntary. Further, insofar as Bryan encouraged him to tell the truth such statements would not vitiate a waiver of rights. "A suggestion to [a] defendant to 'come clean' is more truthful than coercive." Braxton, 112 F.3d at 782.

The record also supports finding that petitioner waived his rights knowingly. The evidence from the hearing indicates that petitioner was 24 at the time he was interrogated and had completed the eighth grade. State Ct. R., Vol. 1 of 15, Tab A at 109, 22. At the time of the interview, he was serving a sentence for assault on a female and had been convicted of at least two prior offenses. Id.

at 140-41. Petitioner read the waiver of rights form and signed it. Id. at 121, 142. Petitioner does not claim he did not understand what he read. He also testified that when he was asked if he wanted a lawyer present, he said no. Id. at 121, 142-43. Considering the totality of the circumstances, including his educational level and previous experience with the justice system, the record supports the finding that petitioner knowingly waived his rights.

Petitioner has failed to show that the North Carolina Supreme Court's ruling is contrary to, or an unreasonable application of, clearly established federal law or is based upon an unreasonable determination of the facts. Respondent's motion for summary judgment as to Claim I is granted.

B.

In Claim II, petitioner argues that the trial court violated his federal constitutional rights by excusing prospective jurors before calling his case for trial. Petitioner contends that immediately before the start of jury selection, the trial judge heard, and ruled upon, requests to be excused from service from 26 prospective jurors. The court excused 21 of these prospective jurors. Petitioner argues that some of these jurors were excused on insufficient grounds and after inadequate questioning. Petitioner first raised this claim on direct appeal. The North Carolina Supreme Court rejected the claim on the merits finding that the trial court did not violate petitioner's constitutional rights or abuse its discretion by removing the jurors before calling petitioner's case for trial. Hyde, 352 N.C. at 51, 530 S.E.2d at 291.

The transcript reflects that on the morning of July 6, 1998, court convened at 10:00 a.m. State Ct. R., Vol. 5 of 15 at 3. At that time, the judge addressed the citizens who had been called as members of the jury pool for that session of court and explained that the court would consider "extraordinary reasons" such as medical problems that would make it difficult for an individual to serve. Id. at 3-4. He then spoke individually with each prospective juror who indicated he or she

12

had such a reason. Id. at 5-17. Most of the requests related to job or childcare responsibilities, prior commitments, or health issues. However, four of the prospective jurors mentioned religious reasons, at least in part, in requesting to be excused from service. Id. at 9, 11, 13.[8] After the court addressed each of the requests, he swore in the jury panel for the session. Id. at 17. The court adjourned for a brief recess and upon returning, the court directed the assistant district attorney to call his first case. Id. at 18. The State called petitioner's case for trial and at that time, the court noted that petitioner was present in the courtroom with both of his attorneys. Id.

Petitioner argues that the state court's denial of relief was based upon an unreasonable construction of the facts and an unreasonable application of the law. Pet. at 20. He argues that the pretrial excusal of jurors violated his "rights to a fair and impartial jury and due process of law under the Sixth and Fourteenth Amendments and Witherspoon v. Illinois, 391 U.S. 510 (1968)." Id. He argues that the court improperly excused jurors who expressed religious objections without adequate voir dire. He also challenges the trial court's handling of requests based upon non-religious reasons and argues the court excused jurors without a significant showing as required by N.C. Gen. Stat. § 9-6(a). For example, he asserts that one prospective juror who was diabetic was excused after she asked to go to her car to get a snack and another juror was excused because she did not have anyone to watch her young children the following day.

Petitioner asserts that this court should undertake de novo review of the Witherspoon portion of his claim. He concedes that the North Carolina Supreme Court recognized his argument that the

---

[8] Joyce Maxey said she was a Jehovah's Witness and also said she was the only one to run her business. State Ct. R., Vol. 5 of 15 at 9. Marion Cruse said he was a Jehovah's Witness and also indicated his bladder condition would prevent him from serving. Id. at 11. Insuk Jones told the judge that because of her religious beliefs she felt she did not have the right to judge anyone. Id. Robert Dewitt indicated he could not serve because of his religious beliefs and because he was doing lawn maintenance as his only source of income. Id. at 13-14.

trial court improperly excused jurors based on religious scruples, but contends that because the state

court did not specifically discuss Witherspoon, that portion of his argument is subject to de novo

review in this court. Cross-Mot. & Resp. at 12-13. However, a state court is not required to

specifically cite to United States Supreme Court cases or federal law for a federal court to apply the

AEDPA standard. See Bell, 236 F.3d at 160; see also Weeks v. Angelone, 176 F.3d 249, 259-60

(4th Cir. 1999); Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir. 1999). Even summary denial of a

claim constitutes an adjudication on the merits to which the AEDPA standard applies. Bell, 236

F.3d at 158. In treating the matter on direct appeal, the North Carolina Supreme Court recognized

petitioner's claim, including his argument that jurors were improperly excused based on religious

beliefs. Citing state law, it held the assignment lacked merit. See Hyde, 352 N.C. at 51, 530 S.E.2d

at 291. Consequently, the state court adjudicated the claim on the merits. Thus, this court may only

consider whether the North Carolina Supreme Court's ruling is contrary to, or an unreasonable

application of, clearly established federal law.

     Petitioner's Witherspoon argument focuses on two of the prospective jurors, Jones and Cruse,

who expressed problems due to religious beliefs. He argues that they were excused based upon

"preliminary indication of conscientious and religious scruples against capital punishment." Pet. at

19.[9] Petitioner contends that because the capital trial was scheduled to begin that morning, the judge

> could not constitutionally excuse jurors in petitioner's absence immediately before
> the case was "called" upon grounds that would be constitutionally inadequate a few
> minutes later. To hold otherwise would imbue a state court judge with discretion to
> nullify the Witherspoon standard with respect to any juror whose general qualms
> about capital punishment were expressed during the "pretrial" call for hardship

---

     [9] This is factually incorrect. Contrary to petitioner's assertion, neither juror mentioned the
death penalty or capital punishment. These jurors indicated only that their religious beliefs precluded
them from judging anyone. State Ct. R., Vol. 5 of 15 at 11. None of the 21 prospective jurors
excused before the start of trial asked the judge to be excused based on their view of the death
penalty. Id. at 3-17.

excuses rather than during jury voir dire proper.

Cross-Mot. & Resp. at 13.

"The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment." United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam). A defendant has a constitutional right to be present at all critical stages of trial, including voir dire. See Gomez v. United States, 490 U.S. 858, 873 (1989). However, the defendant "has no constitutional right to be present at every interaction between a judge and a juror . . . ." Gagnon, 470 U.S. at 526 (quotation omitted).

In Witherspoon, the Supreme Court held that the petitioner's Sixth and Fourteenth Amendment rights to an impartial jury were violated when jurors were excused for cause during voir dire "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon, 391 U.S. at 522. A prospective juror may properly be excused for cause if his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quotation omitted).

Despite Hyde's argument that the timing of the excusals had "no practical significance," Pet. at 13, the timing of the excusals is an essential factor in evaluating the claim of constitutional error. Nothing in Witherspoon extends the holding to a court's pre-trial consideration of requests by members of the jury pool to be removed for personal reasons not related to the case. Nor do the cases that petitioner cites address the situation presented in this claim: the trial court's excusing jurors before the case was called to trial and before the jury pool was sworn. In fact, courts have specifically rejected arguments that a defendant has a constitutional right to be present during the consideration of hardship requests or similar administrative interactions with prospective jurors.

See, e.g., United States v. Greer, 285 F.3d 158, 167-68 (2d Cir. 2002) (finding no error in trial court's exclusion of defendants and counsel from meetings with members of venire about requests to be excused for hardship); United States v. Calaway, 524 F.2d 609, 615-16 (9th Cir. 1975) (affirming conviction where trial court questioned jurors about hardship outside the presence of counsel, defendants, and court reporter), abrogated on other grounds, Bourjaily v. United States, 483 U.S. 171 (1987). Therefore, to find petitioner had a clearly established constitutional right to be present and participate in the court's pre-trial consideration of juror requests for removal would require the court to create a new rule of law.

Finally, petitioner may not obtain relief due to the trial court's alleged failure to comply with N.C. Gen. Stat. § 9-6(a). Section 9-6(a) provides that "excuses from the discharge of [jury service] should be granted only for reasons of compelling personal hardship or because requiring service would be contrary to the public welfare, health, or safety." Federal habeas relief is only available for violations of the Constitution, laws, or treaties of the United States. See 28 U.S. § 2254(a). An error in applying a state statute is not grounds for federal habeas relief. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Petitioner has failed to show that the North Carolina Supreme Court's ruling is contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim II is granted.

C.

In Claim III, petitioner argues that the trial court unconstitutionally restricted his voir dire of prospective jurors Wilkie, Whaley, and Marshburn. He contends that the trial court's limitation on defense questioning violated his right to a fair and impartial jury and to due process of law under the Sixth and Fourteenth Amendments, and cites Witherspoon v. Illinois, 391 U.S. 510 (1968), Morgan

v. Illinois, 504 U.S. 719 (1992), and Chapman v. California, 386 U.S. 18 (1967). He asserts that under Witherspoon and Morgan, a capital defendant must be allowed to question potential jurors as to whether they would automatically impose the death penalty if they found the defendant guilty of first-degree murder. He argues that in his case, the trial court repeatedly sustained objections to questions aimed at determining whether jurors would automatically impose the death penalty.

Petitioner first raised this claim on direct appeal and the North Carolina Supreme Court rejected the claim on the merits. Hyde, 352 N.C. at 53, 530 S.E.2d at 292. The state court found that even assuming counsel's voir dire questions should have been allowed, petitioner was not entitled to relief. Petitioner exercised a peremptory challenge to excuse prospective juror Marshburn and accepted Wilkie and Whaley as jurors even though the defense had two peremptory challenges remaining at the end of voir dire. Citing state law, the court held that petitioner failed to show prejudice in the jury selection process when he had not exhausted his peremptory challenges. Id.[10] Petitioner asserts that the state court's denial of relief is based upon an unreasonable determination of the facts and unreasonable application of federal law. Pet. at 28. He cites Gray v. Mississippi, 481 U.S. 648 (1987), and argues that the issue is not whether any one juror was improperly seated, but centers on the constitutional right of an adequate voir dire. He notes that the petitioner in Witherspoon was not required to show a biased juror was actually seated.

The Sixth and Fourteenth Amendments, "guarantee a defendant on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988). A corollary of that right is a voir dire sufficient to identify unqualified jurors. Morgan, 504 U.S. at 729-30. Capital defendants must be allowed a voir dire sufficient to "identify prospective jurors 'who, even prior to the State's case

---

[10] At the end of jury selection the defense had exercised only 12 of 14 peremptory challenges. State Ct. R., Vol. 3 of 15 at 261; Vol. 4 of 15 at 457, 502, 633.

in chief, [have] predetermined . . . to impose the death penalty.'" <u>Richmond v. Polk</u>, 375 F.3d 309,

330 (4th Cir. 2004) (quoting <u>Morgan</u>, 504 U.S. at 736); <u>see</u> <u>Oken v. Corcoran</u>, 220 F.3d 259, 266

(4th Cir. 2000). At the same time, voir dire is subject to the sound discretion of the trial court. <u>See</u>

<u>Morgan</u>, 504 U.S. at 729. A trial court need not allow a question on voir dire simply because it

would be helpful. The failure to allow a question violates due process only when it would "render

the defendant's trial fundamentally unfair." <u>Mu'Min v. Virginia</u>, 500 U.S. 415, 425-26 (1991).

The defense asked the following questions to Mr. Wilkie during voir dire:

Q: Certainly. What I'm asking you, Mr. Wilkie, is I want you to look at how you really truly feel about the death penalty. Is your support for the death penalty such that you would find it difficult to consider voting for life imprisonment for a person that's been convicted of premeditated first degree murder?

A: No.

Q: You would not find it difficult?

A: No, not at all.

Q: Would your belief in the death penalty, sir, make it hard for you to follow the law and consider life in prison?

A: No.

Q: If a person, if you were to sit on this jury, sir, and you were to convict Mr. Hyde of first degree capital murder, do you feel that he should get the death penalty over life in prison?

Mr. Lee: Objection, Your Honor.

The Court: Overruled. Go ahead and answer.

A: Again, I have to listen to both sides and try to come up with the right decision.

State Ct. R., Vol. 5 of 15 at 196-97.[11]

---

[11] Thereafter, the defense asked Mr. Wilkie if he thought a person should get the death penalty and not life if a person intentionally takes the life of another and is convicted of first degree murder. State Ct. R., Vol. 5 of 15 at 197. The State objected and the court sustained the objection.

The defense questioned Mr. Whaley in pertinent part:

Q: Is your attitude about the death penalty such that you feel that people who have been convicted of premeditated first degree murder should be sentenced to death?

A: Not in all cases.

Q: Not in all cases. When you say "not in all cases" could you tell me what you mean by that?

      Mr. Lee: Objection, Your Honor.

      The Court: Sustained.

Q: Mr. Whaley, is there anything about life in prison without parole which gives you cause for concern?

      Mr. Lee: Objection, Your Honor.

      The Court: Sustained.

Q: Mr. Whaley, again regarding imposition of capital punishment, were the evidence to show, sir, that the defendant in this case, with premeditation –

      Mr. Lee: Objection, Your Honor.

      The Court: Sustained.

Q: Mr. Whaley, do you think that you could give meaningful consideration to arguments and, arguments and evidence in favor of life in prison without parole or do you feel that a person convicted of first degree murder should be sentenced to death?

A: There could be consideration of life in prison.

Q: Have you ever thought or do you, is your attitude such that sort of like the Biblical notion of an eye for an eye, a tooth for a tooth. Do you feel that way, sir?

      Mr. Lee: Objection, Your Honor.

      The Court: Overruled.

      Mr. Lee: Judge, we'd like to be heard.

Id. at 197-98.

The Court:  No, sir.  Overruled.  Answer it.

A:  Not in this day and time, I don't think so.  I mean it's not as simple as that. Sometimes things happen in the course of a crime that can't be controlled, you know, maybe he went in and intended on stealing something and something just went bad, like the other gentleman said.

Id. at 208-10.  Ms. Marshburn was questioned by the defense in pertinent part:

Q:  Ms. Marshburn, would you automatically vote for the death penalty based solely on the fact that a person has been convicted of first degree premeditated murder?

A:  No.

Q:  Is your support of the death penalty such that you may find it difficult to consider life in prison without parole as a possible punishment?

A:  No.

Q:  You could consider that?

A:  Yes, ma'am.

Q:  Ma'am, if you were chosen to sit on this jury and you found the defendant guilty of first degree premeditated, planned murder or felony murder, could you then consider that or presume that the penalty should be death?

A:  No.

    Mr. Lee:  Objection.

    The Court:  Sustained.  Strike the last answer.

Q:  I take it that you as you sit here now, you could consider both penalties?

A:  Right.

Q:  Do you feel at all, ma'am, that a person who takes a life should pay with a life?

A:  No.

    Mr. Lee:  Objection.

    The Court:  Sustained.  And again, strike the answer.

Q:  If you found, ma'am a person guilty of first degree premeditated murder, do you

have a preference as to the correct punishment?

> Mr. Lee: Objection.

> The Court: Sustained.

Q: Ma'am, I recognize that you believe in some cases that the death penalty could be the appropriate punishment. What I'd like to ask you: Do [you] think that your belief about the appropriateness of capital punishment is it so strong that were the defendant found guilty of first degree premeditated murder it would preclude your from engaging the weighing process and reaching a verdict for life in prison?

A: No.

Q: You would, in fact, be able to engage in the weighing process?

A: (Nods affirmatively).

Q: And give serious consideration to both punishments?

A: Right.

State Ct. R., Vol. 3 of 15 at 440-42.

Petitioner has failed to show that the ruling of the North Carolina Supreme Court is contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. Moreover, petitioner's reliance upon Gray v. Mississippi is misplaced. Petitioner cites the Court's language in Gray that "the relevant inquiry is 'whether the composition of the jury panel as a whole could possibly have been affected by the trial court's error.'" Gray, 481 U.S. at 665 (quoting Moore v. Estelle, 670 F.2d 56, 58 (5th Cir. 1982) (specially concurring opinion) (emphasis omitted)). He argues that this language undermines the state court's reasoning that he was not entitled to relief because he had not exhausted his peremptory challenges. However, in Ross v. Oklahoma, the Court explicitly limited this language to the context presented in Gray – when a qualified juror is erroneously excluded on the basis of a Witherspoon challenge. Ross, 487 U.S. at 87-88. Further, the Court in Ross stated "[s]o long as the jury that sits is impartial, the fact

21

that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Id. at 88.[12]

A review of the voir dire shows that Wilkie, Whaley, and Marshburn were all questioned sufficiently to determine whether they could be impartial jurors. Although precluded from asking some questions, the defense was allowed to ask each of the prospective jurors whether they could consider life imprisonment as well as the death penalty and if they believed the death penalty should be automatic for a defendant found guilty of first-degree murder.[13] Further, petitioner does not contend that any of the jurors seated at his trial were not impartial or could not follow the law. He did not challenge jurors Wilkie and Whaley for cause. He also did not exercise peremptory challenges to excuse them despite having not one, but two opportunities to do so.[14] Accordingly, petitioner is unable to show that the ruling of the North Carolina Supreme Court with respect to this claim is contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim III is granted.

---

[12] In Ross, the Court found constitutional error because the trial court failed to remove a prospective juror who indicated he would automatically vote for death if the defendant were found guilty of murder. Ross, 487 U.S. at 85. Nonetheless, the Court affirmed Ross' death sentence because defendant removed the prospective juror with a peremptory challenge and he did not sit on the jury. See id. at 90-91.

[13] This approach contrasts to the voir dire held unconstitutional in Morgan where jurors were only broadly asked whether they could follow the law. See Morgan, 504 U.S. at 723-24, 734-36.

[14] Wilkie and Whaley were members of the first panel. The defense did not challenge them for cause and did not use peremptory challenges to remove them, but removed seven other prospective jurors. State Ct. R., Vol. 3 of 15 at 261. Subsequently during voir dire, defense counsel asked the court to reconsider its denial of the defense's challenges for cause of two prospective jurors, Jones and Kuhn. Id. at 448. Upon reconsideration, the court granted the challenges for cause of Jones and Kuhn. Id. When the court originally refused to excuse Jones and Kuhn, the defense removed them with peremptory challenges. Id. at 261. Therefore, when the court granted the renewed motion it restored two peremptory challenges to the defense. Id. at 449. The court then allowed the defense to go back to the original panel of jurors who had been passed at that time and exercise additional peremptory challenges. State Ct. R., Vol. 4 of 15 at 453-54.

D.

In Claim IV, petitioner argues that the trial court erred by submitting the N.C. Gen. Stat. § 15A-2000(e)(4) aggravating factor at sentencing. Section 15A-2000(e)(4) allows the jury to consider as an aggravating factor whether "the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." N.C. Gen. Stat. § 15A-2000(e)(4). Petitioner argues that there was insufficient evidence to support this aggravating factor. He contends that because the jury relied upon an improperly submitted aggravating factor he was denied due process of law and the right to be free from cruel and unusual punishment. Petitioner first raised this claim on direct appeal. The North Carolina Supreme Court rejected the claim on the merits finding the evidence was sufficient to support submission of the factor. Hyde, 352 N.C. at 56, 530 S.E.2d at 294. The court found that the evidence showed petitioner killed the victim because he believed the victim would report him to the police. Id. at 55, 530 S.E.2d at 294. It noted that petitioner's statements to the police were corroborated by statements petitioner made to his girlfriend, Ginger Guthrie, after the murder. Id.

As petitioner asserts, North Carolina law has recognized that "[i]n a broad sense every murder silences the victim, thus having the effect of aiding the criminal in the avoidance or prevention of his arrest. It is not accurate to say, however, that in every case this 'purpose' motivates the killing." Pet. at 29 (quoting State v. Goodman, 298 N.C. 1, 26, 257 S.E.2d 569, 586 (1979)). To submit the section 15A-2000(e)(4) aggravating circumstance, "there must evidence from which the jury can infer that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime." Goodman, 298 N.C. at 27, 257 S.E.2d at 586. To determine whether the evidence was sufficient to support the existence of an aggravating factor, a court must consider whether "viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements . . .

beyond a reasonable doubt." Roach v. Angelone, 176 F.3d 210, 218 (4th Cir. 1999) (quoting

Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Petitioner argues that the state court's ruling is an unreasonable construction of the facts and

an unreasonable application of clearly established federal law.  Petitioner argues there was

insufficient evidence to support the aggravating factor.  He contends that the evidence shows, at

most, petitioner's after-the-fact state of mind, but not his purpose at the time of the crime.[15]  He

contends that submitting the section 15A-2000(e)(4) factor when it was not supported by the

evidence resulted in an overbroad, unconstitutionally vague, and arbitrary application of the death

penalty in violation of Woodson v. North Carolina, 428 U.S. 280, 304 (1976), Gregg v. Georgia,

428 U.S. 153, 188 (1976), and Furman v. Georgia, 408 U.S. 238 (1972).  Petitioner argues that these

cases require that a jury be objectively guided in considering the death penalty and that the process

provides a "'meaningful basis' for distinguishing the few cases in which [the death penalty] is

imposed from the many cases in which it was not." Gregg, 428 U.S. at 188.

At trial, Detective Condry testified for the State as follows:

A: At that point, Sheriff Brown asked Mr. Hyde, " what was your intention when
you used the saw?" To which Mr. Hyde replied I guess to kill him – this is a quote
I'm sorry, I guess to kill him I guess we thought – I'm sorry.  I guess we thought he
would tell the next day if we didn't after all we did unquote.

State Ct. R., Vol. 2 of 15 at 136-37.  Ginger Guthrie testified in pertinent part:

A: I asked him I said, "Why didn't you leave him alone?  He wouldn't have said
nothing, he wouldn't have said a thing."

_____

[15] Petitioner contends that in addressing this claim respondent improperly relies upon
evidence which was first elicited at the post-conviction hearing that petitioner returned to the crime
scene to kill the victim. Because this evidence was not before the North Carolina Supreme Court
on direct appeal, this court will not consider it in assessing the merits of the claim.  See Wilson v.
Moore, 178 F.3d 266, 272-73 (4th Cir. 1999); Bell, 236 F.3d at 171 n.13.

Q: Who wouldn't have said nothing?

A: Les. He wouldn't have said a thing.

Q: You asked Mr. Hyde that?

A: Unh hunh.

Q: What did Mr. Hyde say?

A: Well, he wasn't for sure about that after all that he knows he stabbed him with the drill bit and everything; he wasn't too sure about that.

State Ct. R., Vol. 9 of 15 at 225. Sheriff Brown also testified. During his testimony he read from

State's Exhibit 35, which consisted of his notes written contemporaneously as petitioner made his

statement. Id. at 261. Sheriff Brown read:

A: . . . I laid the drill bit down then I cut his throat with the saw. Joel helped me. What were you trying to do with the saw?

Q: Is that what you asked him, sir?

A: Yes, right. Unh hunh. Trying to kill him. After all the other stuff if we didn't kill him we knew he would tell on us the next day.

Id. at 265.

Petitioner attacks the state court's ruling in part on its treatment of Sheriff Brown's

testimony. He argues that the court treated Brown's testimony as if he had given a verbatim account

of petitioner's words. He argues that Sheriff Brown did not testify he was giving an exact recital

of what petitioner said during the interrogation. Petitioner asserts that Sheriff Brown's testimony

about petitioner's statement should be taken only as corroborative evidence of Detective Condry's

account in which petitioner explained his intention when using the saw by stating "I guess to kill

him. I guess we thought he would tell the next day if we didn't after all we did." State Ct. R., Vol.

2 of 15 at 136-37; see also Condry Interrogation Notes, App. to Pet., Vol. 1 of 1, Tab 11. He asserts

that Detective Condry's version shows only that:

> three months after the murder, when called upon by a law enforcement officer to explain his reason for killing the victim, petitioner had to "guess" at what his purpose might have been, because all that petitioner actually remembered was that his original intention in joining in the crime was "just to be the muscle to help them get the herb."

Pet. at 31.

Petitioner has failed to demonstrate he is entitled to relief on this claim. In its ruling, the

North Carolina Supreme Court stated:

> The evidence in the case before us tends to show that defendant burglarized the victim's residence and that he killed him since he believed the victim would report him to the authorities. While defendant was describing the assault on the victim in his statement to police investigators, Sheriff Brown asked defendant , "[W]hat was your intention when you used the saw?" Defendant replied, "I guess to kill him . . . I guess we thought he would tell the next day if we didn't [kill him] after all we did." "Trying to kill him. After all the other stuff[,] if we didn't kill him we knew he would tell on us the next day."

Hyde, 352 N.C. at 55, 530 S.E.2d at 294. In referring to petitioner's response about the saw, the

state court not only cited Sheriff Brown's account, but also cited petitioner's statement to Detective

Condry.

Despite petitioner's argument, Detective Condry's testimony amply supports the state court's

finding that there was sufficient evidence to submit the section 15A-2000(e)(4) aggravating factor

to the jury. The victim knew petitioner well. At the time petitioner started to saw the victim's

neck, the perpetrators had already stabbed the victim and hit him on the head with a pipe knocking

him to the floor. Given these circumstances, a jury could reasonably infer from Detective Condry's

account of petitioner's response that petitioner continued his brutal attack in order to kill, and thereby

silence, the victim so he would not go to the police. Further, the state court noted, petitioner's

statement given during police questioning was corroborated by his conversation with Ms. Guthrie

in which he also indicated they killed the victim so he would not turn them into the police.

Although petitioner argues for a different interpretation of the evidence, the evidence supports submission of the section 15A-2000(e)(4) aggravating factor and the jury's finding that petitioner was motivated to kill the victim to prevent him from going to the police.

Because the section 15A-2000(e)(4) aggravating factor was properly submitted, petitioner has failed to show the death penalty was imposed in an unconstitutionally vague or arbitrary manner in violation of Furman, Woodson, or any other clearly established federal law. Accordingly, respondent's motion for summary judgment as to Claim IV is granted.

E.

In Claim V, petitioner argues that his constitutional rights were violated because the trial court failed to intervene *ex mero motu* when the prosecutor made an allegedly improper closing argument at the sentencing phase of trial. Petitioner first raised this claim on direct appeal. See Hyde, 352 N.C. at 56, 530 S.E.2d at 294. However, respondent contends that because the defense failed to object to the allegedly improper argument during trial, the North Carolina Supreme Court only reviewed the issue for plain error which does not constitute an adjudication on the merits. Thus, respondent cites Daniels v. Lee, 316 F.3d 477, 487-88 (4th Cir. 2003), and argues that the claim is procedurally defaulted.

Under the doctrine of procedural default, a federal court is precluded from reviewing the merits of any claim found to be procedurally barred by the state court on independent and adequate state grounds. Id. A state rule is "adequate" if it is firmly established and regularly and consistently applied by the state court. Johnson v. Mississippi, 486 U.S. 578, 587 (1988); McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000). A state rule is "independent" if it does not depend upon a federal constitutional ruling. See Ake v. Oklahoma, 470 U.S. 68, 74-75 (1985); McNeill v. Polk, 476 F.3d 206, 211 (4th Cir. 2007).

A federal habeas court may review procedurally defaulted claims if the petitioner demonstrates cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice. See, e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991). To show cause, a petitioner must show something external prevented him from complying with the state procedural rule. Id. at 753. To show prejudice, a petitioner must show he was actually prejudiced as a result of the alleged violation of federal law. See United States v. Frady, 456 U.S. 152, 167-69 (1982).

> In considering this claim on direct appeal, the North Carolina Supreme Court stated:
>
> During the sentencing hearing, defendant failed to object during closing argument. Thus, "defendant must establish that the argument was so grossly improper that the trial court abused its discretion by not intervening *ex mero motu*. To establish such an abuse, defendant must show the prosecutor's comments so infected the trial with unfairness that it rendered the conviction fundamentally unfair." State v. Robinson, 346 N.C. 586, 606-07, 488 S.E.2d 174, 187 (1997).

Hyde, 352 N.C. at 56, 530 S.E.2d at 294. The North Carolina Supreme Court held that the prosecutor's statements informed the jury about a properly submitted aggravating circumstance, did not improperly compel the imposition of the death sentence, and were not "grossly improper" so as to require the trial court to intervene *ex mero motu*. Id. at 57, 530 S.E.2d at 295.

The North Carolina Supreme Court regularly and consistently procedurally bars claims when a petitioner fails to contemporaneously object. See, e.g., State v. Bell, 359 N.C. 1, 27-28, 603 S.E.2d 93, 111-12 (2004); State v. Garcia, 358 N.C. 382, 410-411, 597 S.E.2d 724, 745 (2004); State v. McNeil, 350 N.C. 657, 674-75, 518 S.E.2d 486, 497 (1999); State v. Daniels, 337 N.C. 243, 275-81, 446 S.E.2d 298, 318-22 (1994). A contemporaneous objection rule is an independent and adequate basis for a procedural default. See Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977). A state court's review of a claim for plain error or to "assess whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" does

not waive the procedural bar. See Daniels, 316 F.3d at 487 (citation omitted).

Petitioner argues that the claim is not procedurally defaulted because "[a] trial judge's failure to intervene in a prosecutor's closing argument *ex mero motu* (that is, in the absence of objection, constitutional or otherwise), is a claim that the North Carolina Supreme Court routinely considers." Cross-Mot. & Resp. at 21. He asserts that in reviewing the claim for error rendering the trial fundamentally unfair, the North Carolina Supreme Court treated the claim on the merits. Petitioner also argues that the North Carolina Supreme Court's review applied the due process standard set forth in Darden v. Wainwright, 477 U.S. 168, 181 (1986). Hence, he argues that "the alleged procedural default is not 'independent' from the federal constitutional law standard" applicable to his claim and the procedural bar is not adequate. Id. at 21-22; see Ake, 470 U.S. at 75 (finding that a state procedural rule is not independent when its resolution depends on a federal constitutional ruling).[16]

In Daniels, the Fourth Circuit considered whether the petitioner's claim that his constitutional rights were violated by the prosecutor's closing argument was procedurally defaulted. On direct appeal, the North Carolina Supreme Court addressed Daniels' claim by stating:

> We note that no objection was made during the prosecutor's closing argument. However, in a capital case, an appellate court may review the prosecution's argument, even though defendant raised no objection at trial. In order to prevail under such an argument, however, "the impropriety of the argument must be gross

---

[16] Petitioner also cites Billings v. Polk, 441 F.3d 238, 249-50 (4th Cir. 2006), in support of this argument and states that the Fourth Circuit declined to apply the procedural bar in a similar case. Cross-Mot. & Resp. at 22. In Billings, the Fourth Circuit recognized the petitioner's argument that the procedural bar was not an independent and adequate basis to support a procedural default, but stated "[w]e decline to resolve whether this case is governed by Ake because we agree with the district court that, even if Billings' claim is not procedurally barred, it fails on the merits." Billings, 441 F.3d at 250.

Billings merely recognizes the argument. It does not support either petitioner's or respondent's position.

indeed," State v. Johnson, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979), such that this Court would "hold that a trial judge abused his discretion in not recognizing and correcting [the argument] *ex mero motu*," id. In order to constitute such an abuse of discretion, the prosecutor's comments must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).

State v. Daniels, 337 N.C. 243, 275-76, 446 S.E.2d 298, 318-19 (1994). The Fourth Circuit held that the claim was procedurally defaulted and reasoned that the state court's consideration of whether the comments were so improper that the trial court had a duty to intervene *ex mero motu* did not constitute an adjudication on the merits. Daniels, 316 F.3d at 487-88. In light of Daniels, Hyde's claim is procedurally defaulted. Moreover, Hyde fails to argue cause and prejudice or that the failure to consider the claim will result in a fundamental miscarriage of justice to overcome the procedural default.

Alternatively, petitioner's claim fails on the merits. To obtain a new sentencing proceeding based on a prosecutor's improper closing argument, a petitioner must demonstrate that the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181. In determining whether petitioner has carried his burden, the court considers "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." Bennett v. Angelone, 92 F.3d 1336, 1345-46 (4th Cir. 1996) (internal quotation omitted).

Petitioner asserts that during closing arguments at sentencing, the prosecutor asked the jury to consider that petitioner killed the victim in his own home as grounds to impose the death penalty. Petitioner argues that because this is not one of the enumerated aggravating factors, the jury was not properly guided in considering the death penalty.

The prosecutor argued in pertinent part during his closing argument:

And folks, the State has submitted factors for it; anchors to justify your verdict. This murder was committed while this particular defendant was engaged in the commission of a burglary. The State has proven that beyond a reasonable doubt. This circumstance alone demands the death penalty. Now, throughout the proceedings in this particular case the only thing these folks over here want to tell you about Leslie Howard is that he used drugs, he sold drugs, okay. This is all they wanted you to know. In the first phase, they told you, the first phase of this trial they told you the reason you needed to know this was the State was trying to hide something from you. Okay. Of course, they made that statement without us making an opening statement, so I don't know how we can hide something, but in any event, that was the reasoning. That was their reasoning for bringing this man's name through the mud after this particular defendant had stabbed him. After he had bludgeoned him, after he had sawed on his neck with a saw. It's not enough. They have to drag his name through the mud in front of his family and they say the reason is because the state's trying to hide something. Well, folks, think about what the State did during the first part of this trial. We introduced the defendant's confession through three separate witnesses and each one of those statements it said the reason he was going there was to buy drugs. How can we be trying to hide something in that situation? No, sir. That's not the reason they did it. They did it to drag this victim's name through the mud. Now, what the defendant did bother to tell you is that on the night he was brutally murdered by this particular defendant, he wasn't out using drugs. He wasn't out selling drugs, no. Leslie Howard, I submit to you, was probably doing the exact same thing that many of you were doing that night at midnight. He was **in his own home**, in his own bedroom, **in his own bed** sleeping. Minding his own business. You know they bring up all these mitigating circumstances. The defendant's alcoholism. The fact that people have insulted the defendant before. Well, folks, there's nothing in this case that says anything about that has anything to do with this case. This isn't a situation where the victim was out at some bar talking junk to this particular defendant. Okay? There's no evidence this victim insulted this particular defendant in any way. No evidence of anything other than the fact the victim was **in his own home** minding his own business. And where else on this earth do you have a right to be protected from all the evil out there than **in your own home**? Where else can you be safe? While Leslie was lying there **in his own bed**, he was subjected to this vicious attack **in his own bed**. He was forced onto his own floor after he was stabbed, after he was beaten about the head on to his floor, the place where he was paying rent. He had to lie there and take this from them. He was on his own floor when this particular defendant made the decision to take the chair out and put it down on his legs. How did it happen? Was the defendant sitting in that chair on his legs while he was sawing on his neck? Was one of the defendant's buddies there holding that chair while the defendant sawed on the neck or maybe after the defendant got too sick to finish what he started, maybe the defendant himself, held the chair while one of his other buddies sawed on his neck. That's for you to decide. Y'all had an opportunity to view the photos of the crime scene. You had an opportunity to see the surroundings that Leslie looked at while this particular defendant stabbed him, while he bludgeoned him while he sawed on his neck. He's sitting **in his own home** surrounded [sic] by his own

pictures, apparently his family members. While this indignity is being inflicted upon him he was in his own home forced essentially to beg for his life. "Wayne, why are you doing this to me? Wayne, why are you doing this to me? That's what he said while this particular defendant was doing this to him. And folks, all the alcohol he drank, whether he had a good or bad mother, whatever his father [sic] did, whatever society did, doesn't call for that. Does not make that any less deserving of the maximum punishment under the law. **Folks, if this happens to a person in their own home, the person who does that deserves the maximum punishment under the law. The maximum punishment under the law is death.** That's what this case calls out for. And that's why this particular circumstance carries a lot of weight. This isn't some society wasn't nice to me, this isn't some my father wasn't nice to me. **This is a man in his own home,** minding his own business, being assaulted by someone; being murdered by someone. That factor alone is enough to call for the death penalty. But folks, this is not all we have here. **It's not just the fact that this particular defendant committed this particular offense while engaged in first degree burglary. That's not all we have here.** This particular defendant also killed, also murdered Leslie Howard to save his own skin.

State Ct. R., Vol. 8 of 15 at 366-70 (emphasis added). Petitioner argues that by making references to petitioner being in his own home and stating "[f]olks, if this happens to a person in their own home, the person who does that deserves the maximum punishment under the law. That maximum punishment under the law is death," the State requested the jury to consider an aggravating circumstance not authorized by law. Pet. at 35.

In addressing petitioner's argument on direct appeal, the North Carolina Supreme Court noted that one of the aggravating factors submitted to the jury was that "[t]he capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of . . . burglary." Hyde, 352 N.C. at 57, 530 S.E.2d at 294-95. The court further noted that first-degree burglary requires "that the dwelling be actually occupied at the time of the intrusion." Id. (citing State v. Fields, 315 N.C. 191, 196, 337 S.E.2d 518, 521 (1985)). The court reasoned that the prosecutor's argument appropriately informed the jury about the aggravating circumstance that the offense occurred while petitioner was engaged in first-degree burglary. Id. The court concluded that the argument did not compel the imposition of the death sentence based on any circumstance

not listed as a statutory aggravating factor, was not "grossly improper," and did not require the trial court to intervene *ex mero motu*. Id.

Petitioner has not shown that the state court's ruling involved an unreasonable application of clearly established federal law. Reviewed in the context of the entire argument, the prosecutor's statements did not present an improper aggravating circumstance to the jury. Rather, the argument accentuated the nature of the crime, including that the capital murder was committed while petitioner was engaged in burglary. The prosecutor also responded to the defense's attack on the victim's character as a drug dealer by noting that the victim was not engaged in any criminal behavior at the time of the offense. Further, to the extent the prosecutor arguably overemphasized that petitioner was in his own home, the argument was not so "grossly improper" as to amount to a denial of due process. The evidence of petitioner's guilt in murdering the victim was overwhelming, and the jury found two other aggravating factors in support of the death penalty. Accordingly, respondent's motion for summary judgment as to Claim V is granted.

F.

In Claim VI, petitioner argues that the trial court's instruction on mitigating factors failed to adequately guide the jury's discretion and resulted in an arbitrary application of the death penalty. He contends that the trial court's instruction failed to explain the significant distinction between statutory and non-statutory mitigating factors and permitted the jurors to give the statutory mitigating factors any weight, including no weight at all. Pet. at 38-39. Petitioner first raised this claim on direct appeal. The North Carolina Supreme Court rejected the claim on the merits finding that the trial court's instruction was proper and "conveyed to the jury that it must give value to found statutory mitigators." Hyde, 352 N.C. at 58, 530 S.E.2d at 295.

At trial, petitioner asked the court to give a jury instruction explaining and highlighting the

difference between statutory and non-statutory mitigating factors.[17] He also asked the trial court to

instruct the jurors that if they found the evidence supported a statutory mitigating circumstance, then

they must give it weight in determining whether the mitigating factors outweighed the aggravating

factors.[18] The trial court declined to give the requested instructions and instead said it would instruct

---

[17] In requested instruction No. 8, petitioner asked the trial court to instruct the jurors:

> There are two categories of mitigating circumstances. Those mitigating circumstances which our legislature has determined to be, as a matter of law, in mitigation of punishment in every case if proven and those which may be mitigating circumstances in individual cases.
>
> As to those mitigating circumstances that our legislature has determined are by law in mitigation of punishment, those circumstances are referred to as statutory mitigating circumstances. I instruct you that as to the statutory mitigating circumstances you must consider these factors in the Defendant's favor in mitigating against the death penalty and give them weight in your determination of whether the mitigating circumstances outweigh the aggravating circumstance. This is true even though you may disagree with the legislature that these factors should be considered in the Defendant's favor in mitigating against the death penalty.
>
> The other group of mitigating circumstances are referred to as non-statutory mitigating circumstances. As to these mitigating circumstances, you must first determine whether that circumstance has been proven by the Defendant by a preponderance of the evi dence. Second, you must determine whether it has mitigating value and should be considered in the Defendant's favor in mitigating against the death penalty. If you find both that the factor has been proven and that it has mitigating value, then you must give it weight in your determination of whether the mitigating circumstances outweigh the aggravating circumstance.
>
> As I go through each of the listed mitigating circumstances, I will inform you as to whether that mitigating factor is a statutory mitigating circumstance and by law must be considered in the Defendant's favor in mitigation of punishment if found to be proven or whether it is a non-statutory mitigating circumstance and you must determine whether it is in mitigation of punishment.

State Ct. R., Vol. 12 of 15, Tab D at 54-55.

[18] In requested instruction No. 9, petitioner asked the court to instruct the jurors after each statutory mitigating factor that:

> This mitigating circumstance is a statutory circumstance and by law is a circumstance in mitigation of punishment. Therefore (if you find that the Defendant has proven that) (read the mitigating circumstance) or (since all of the evidence shows that) (read the mitigating circumstance)[.]

the jurors based on the North Carolina Pattern Jury Instruction ("N.C.P.I."). State Ct. R., Vol. 8 of

15 at 303-04. The court reasoned the pattern jury instructions included everything that had been

requested by the defense. Id.

At trial, the court instructed the jury in pertinent part:[19]

Issue two: Do [you] find from the evidence the existence of one or more of the following mitigating circumstances? Forty-one possible mitigating circumstances are listed on the form and you should consider each of them before answering issue two.

A mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse for a killing or reduce it to a lesser degree or crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first degree murders. Our law identifies several possible mitigating circumstances. However, in considering issue two, it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character, or record and any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death. And any other circumstance arising from the evidence which you deem to have mitigating value.

The defendant has the burden of persuading you that a given mitigating circumstance exists. The existence of any mitigating circumstance must be established by a preponderance of the evidence. That is, the evidence taken as a whole must satisfy you not beyond a reasonable doubt, but simply satisfy you that any mitigating circumstance exists. If the evidence satisfies any of you that a mitigating circumstance exists, you would indicate that finding on the issues and recommendation form. A jury may find that any mitigating circumstance exists by a preponderance of the evidence whether or not that circumstance was found to exist by all the jurors. In any event, you would move on to consider the other mitigating

---

I hereby instruct you that you must (answer this mitigating factor "yes" and – if peremptorily instructed) consider this factor in the Defe ndant's favor in mitigation against the death penalty. You must also give this factor weight in determining whether the mitigating circumstances outweigh the aggravating circumstances and when considering whe ther the aggravating circumstance is sufficiently substantial to call for the imposition of the death penalty when considered in light of the mitigating circumstances.

State Ct. R., Vol. 12 of 15, Tab D at 56.

[19] The instruction given by the trial court conforms to the North Carolina Pattern Jury Instruction in effect in 1998. See N.C.P.I. Crim.-150.10 (June 1997). It remains unchanged. N.C.P.I. Crim.-150.10 (May 2004).

circumstances and continue in like manner until you have considered all of the mitigating circumstances listed on the form and any others which you deem to have mitigating value. It is your duty to consider the following mitigating circumstances and any others which you find from the evidence.

State Ct. R., Vol. 10 of 15 at 436-37. The court enumerated the statutory mitigating factors and

for each one instructed essentially as follows:

The defendant has the burden of establishing this mitigating circumstance by the preponderance of the evidence as I have explained to you. Accordingly, as to this mitigating circumstance, I charge you that if one or more of you find the facts to be as all the evidence tends to show, you will answer "yes" as to mitigating circumstance number two on the issues and recommendation form.

Id. at 439; see also id. at 438, 440-41, 442-43. After going through the six statutory mitigating

circumstances, the court stated:

You should also consider the following circumstances arising from the evidence which you find to have mitigating value.
    If one or more of you find by a preponderance of the evidence that any of the following circumstances exist and also are deemed by you to have mitigating value, you would so indicate by having your foreperson write "yes" in the space provided. If none of you find the circumstance to exist or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write "no" in that space.

Id. at 443. The court then went through each of the non-statutory mitigating circumstances the jurors

were to consider. For each of the 35 non-statutory mitigating factors, the trial court instructed the

jurors essentially as follows:

If one or more of you finds by a preponderance of the evidence that this circumstance exists and also is deemed mitigating, you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance on the issues and recommendation form. If none of you find the circumstances to exist or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write "no" in that space.

Id.

In treating the claim on direct appeal, the North Carolina Supreme Court cited state law and

noted that "[i]f a juror determines that a statutory mitigating circumstance exists, . . . the juror must

36

give that circumstance mitigating value." Hyde, 352 N.C. at 57, 530 S.E.2d at 295 (quoting State v. Jaynes, 342 N.C. 249, 285, 464 S.E.2d 448, 470 (1995)). The state court found it had previously considered and rejected the argument petitioner was raising. Id. at 58, 530 S.E.2d at 295. It concluded that "'defendant's request for an instruction that conveyed to the jury that it must give value to found statutory mitigators was fulfilled by the instruction given.'" Id. (quoting State v. Conner, 345 N.C. 319, 328, 480 S.E.2d 626, 629 (1997)).

Petitioner argues that the trial court's general definition of mitigating circumstances indicated that all mitigating factors were the same. He also argues that nothing in the instruction suggested to the jurors that they had to give the mitigating factors any value when it came to weighing the mitigating circumstances against the aggravating circumstances in addressing Issue Three. He contends that the Issue Three instruction stating, "you must decide from all the evidence what value to give to each circumstance and then weigh the aggravating circumstances so valued against the mitigating circumstances so valued and finally determine whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances" actually gave the jurors unrestrained discretion. Pet. at 39 (citing State Ct. R., Vol. 10 of 15 at 467).

In support of the claim, petitioner cites Woodson v. North Carolina, 428 U.S. 280, 304 (1976), Gregg v. Georgia, 428 U.S. 153, 188 (1976), and Furman v. Georgia, 408 U.S. 238 (1972), for the general proposition that the jury must be adequately guided in its consideration of the death penalty. Petitioner asserts that the state court's decision concerning the instruction was based upon an unreasonable construction of the record and controlling federal precedent. Petitioner also argues that the instruction allowed the jurors to give the statutory mitigating circumstances no weight resulting in an arbitrary sentencing process in violation of Eddings v. Oklahoma, 455 U.S. 104, 114 (1982), and Lockett v. Ohio, 438 U.S. 586, 604 (1978).

Jurors in a capital case may not be prevented from considering "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604. In Eddings, the Court relied on Lockett and held that a sentencer cannot refuse to consider a mitigating factor. The Court held that a sentencer may choose what weight to give the factor, but cannot refuse to consider it. See Eddings, 455 U.S. at 114-115. When a petitioner asserts an instruction prevented jurors from considering mitigating evidence, a court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990). The alleged error in the instruction must be reviewed in the context of the overall charge. Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

The trial court's instruction did not violate Lockett, Eddings, or any other clearly established federal law. The instruction did not preclude the jury from considering any mitigating evidence, but required the jury to consider all of the evidence and circumstances offered in mitigation and directed the jurors to weigh the mitigating factors they found to exist against the aggravating factors. In instructing the jury on weighing the mitigating evidence and aggravating evidence with respect to Issue Three the court stated, "[i]f you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances." State Ct. R., Vol. 10 of 15 at 466. With respect to Issue Four the jurors were instructed, "[y]ou are not to consider the aggravating circumstances standing alone. You must consider them in connection with any mitigating circumstances found by one or more of you." Id. at 468. Finally, to the extent the jurors were instructed to determine what weight to give the mitigating circumstances, the instruction was constitutional. While jurors may not exclude evidence from consideration, the Supreme Court has

explicitly stated, "[t]he sentencer . . . may determine the weight to be given relevant mitigating evidence." Eddings, 455 U.S. at 114-15.

Petitioner has failed to show that the ruling of the North Carolina Supreme Court is contrary to, or an unreasonable application of, clearly established federal law or is based upon an unreasonable determination of the facts. Respondent's motion for summary judgment as to Claim VI is granted.

G.

In Claim VII, petitioner argues that he received ineffective assistance of counsel because his attorneys failed to present a voluntary intoxication defense at the guilt phase of trial. Petitioner also argues that counsel were ineffective because when the evidence of his intoxication on the night of the crime was ultimately presented at sentencing, his attorneys failed to adequately prepare the experts called in support. Petitioner first presented this claim in his MAR, and the MAR court denied the claim on the merits. MAR Order at 3.

In considering petitioner's claim of ineffective assistance of counsel, the MAR court held a two-day evidentiary hearing in December 2004. See id. at 1. At the hearing, petitioner presented evidence from Dr. Glenn Rohrer, an expert in social work and substance abuse; Dr. Brian McMillen, an expert on forensic pharmacology; and Dr. George Corvin, a forensic psychiatrist. Dr. Rohrer and Dr. McMillen had testified as defense experts at petitioner's sentencing trial. The State presented evidence from Detective Condry and petitioner's trial counsel, Mark Raynor and George Geracos. After considering all of the evidence, as well as the arguments of counsel, the court held that petitioner failed to satisfy either prong of Strickland v. Washington, 466 U.S. 668 (1984). See MAR Order at 3, 44. In reaching this conclusion, the MAR court found that trial counsel had considered raising a defense based on voluntary intoxication at the guilt phase of trial and "made

39

diligent and objectively reasonable investigative efforts to determine the viability of such a defense."
Id. at 43. The MAR court found that trial counsel "reasonably did not believe that sufficient
evidence could be presented at the guilt/innocence phase of the trial to convince the jury that Hyde
was so impaired at the time of the murder that he lacked the ability to form the specific intent to kill
after premeditation and deliberation." Id. at 43-44. It found that counsel made objectively
reasonable efforts to retain and use the service of experts Dr. Rohrer, Dr. McMillen, and mitigation
specialist June Waller. Id. at 44. The MAR court found that "[t]rial counsel diligently investigated,
developed and presented mitigating evidence." Id. at 45. The MAR court found that counsel made
objectively reasonable efforts to prepare the experts for cross-examination. Id. at 21.

        To establish ineffective assistance of counsel, a petitioner must show that counsel's
representation "fell below an objective standard of reasonableness" and that there is a "reasonable
probability that, but for counsel's unprofessional errors, the result of the proceeding would have been
different." Strickland, 466 U.S. at 688, 694. In representing a defendant, "[c]ounsel has a duty to
make reasonable investigations or to make a reasonable decision that makes particular investigations
unnecessary." Id. at 691. Counsel are not required "to investigate every conceivable line of
mitigating evidence no matter how unlikely the effort would be to assist the defendant at
sentencing." Wiggins v. Smith, 539 U.S. 510, 533 (2003). In a capital sentencing trial, the question
with respect to prejudice is "whether there is a reasonable probability that, absent the errors, the
sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances
did not warrant death." Strickland, 466 U.S. at 695. "Judicial scrutiny of counsel's performance
must be highly deferential." Id. at 689. "A fair assessment of attorney performance requires that
every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances

of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.

Petitioner argues that there was substantial evidence he was too intoxicated the night of the murder to form specific intent. In support of his claim he refers to a statement by his girlfriend, Ginger Guthrie, that petitioner was a heavy drinker and used drugs on a daily basis. He also refers to a statement by Dana Knaul, the girlfriend of co-perpetrator James Blake, that petitioner "drank, smoked pot, and took some blue pills" and that co-defendant Coleman told the police that everyone was "outside getting high" that night. App. to Pet., Vol. 1 of 1, Tabs 21, 22. Petitioner also argues that it was improper for his attorneys to rely upon his recollection given his history of substance abuse and given that Ms. Guthrie had indicated that petitioner told her the men had been drinking, smoking marijuana, and snorting blue pills on the day of the murder.[20]

Petitioner has failed to show the MAR court erred in analyzing counsels' performance under Strickland and its progeny. Petitioner simply re-argues the evidence presented at the state court hearing and selectively presents evidence that supports a voluntary intoxication defense. He fails, however, to address or acknowledge the many problems the state court found with presenting such a defense in his case. Considering the evidence in its entirety, the record fully supports the state court's ruling.

The evidence elicited at the hearing shows that counsel thoroughly investigated the possibility of a voluntary intoxication defense. They consulted with Drs. Rohrer and McMillen, "role played" the presentation of such a defense, consulted with psychiatrist Dr. Barnes who evaluated petitioner, consulted with other lawyers, spoke with petitioner about his use of alcohol and

---

[20] Counsel testified that they believe the "blue pills" were the prescription medication Xanax. State Ct. R., Vol. 14 of 15, Tab G at 174.

drugs, traveled across the country to speak with petitioner's family and friends about his use of alcohol and drugs, considered potential witnesses, and re-visited the issue consistently during the two years before trial and during trial. <u>See</u> State Ct. R., Vol. 14 of 15, Tab G at 157, 172, 176, 182, 263, 286. Based upon their professional experience, counsel concluded there was not sufficient evidence to support a voluntary intoxication defense and made a strategic decision to save the evidence for mitigation at sentencing.

In reaching the decision not to pursue a voluntary intoxication instruction at the guilt phase, trial counsel recognized various problems. First, they considered the fact that petitioner had given the police a detailed statement about the crime and had sketched the weapons used in the attack. <u>Id.</u> at 244-45. To establish voluntary intoxication, a defendant must show that his level of intoxication made it impossible to conceive the requisite intent. "Evidence of mere intoxication" is not sufficient. <u>State v. Mash</u>, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988). Counsel believed that this clear recollection of the events undermined the argument that petitioner was so intoxicated he did not know what he was doing. State Ct. R., Vol. 14 of 15, Tab G at 244-46.

Counsel also noted that petitioner consistently told them he had only consumed two 40 ounce beers the day of the murder. <u>Id.</u> at 173-75. Counsel testified that when they learned about Ms. Guthrie's statement which indicated petitioner had ingested a large quantity of alcohol and drugs, they spoke with petitioner about her statement and the possibility of a voluntary intoxication defense. <u>Id.</u> at 175, 264. Petitioner continued to insist he only had two 40 ounce beers the day of the murder. <u>Id.</u>[21] Counsel attempted to interview Guthrie, but she was a minor and her father would not allow

---

[21] Petitioner did not testify at the evidentiary hearing; therefore, he did not dispute counsels' version of these events.

them to speak with her. Id. at 169-70.[22]

Counsel also testified that before trial the State believed petitioner had returned to the crime scene to retrieve weapons he had left behind. However, petitioner had admitted to counsel that he returned to the victim's house specifically to kill the victim. Id. at 157-58. Counsel indicated that a primary concern for the defense in preparing the case was keeping the State from discovering the purpose of this second trip which would establish premeditation and deliberation. Raynor noted that for this reason they did not want to risk petitioner testifying. Id. Similarly, although counsel were aware of a statement that Ms. Knaul made about petitioner's drug use the night of the crime, they did not want to risk disclosing information she knew about petitioner's return to the scene by pursuing her as a witness. Id.

In making the decision not to assert voluntary intoxication at the guilt phase, counsel also testified that they considered their experience with Onslow County juries which were typically resistant to such a defense. Id. at 158, 178-80, 262-63. Counsel considered that if the jury rejected the voluntary intoxication defense at the guilt phase, the evidence would likely lose any mitigating impact at sentencing. Id. at 158, 172, 263-64, 268.

The record demonstrates counsel thoroughly investigated a voluntary intoxication defense and decided against it only after weighing the possible benefits and pitfalls. Petitioner has failed to show the MAR court's ruling with respect to counsel's assistance at the guilt phase of trial is contrary to, or an unreasonable application of, Strickland or that the state court made an unreasonable determination of the facts.

Petitioner also has failed to show that the MAR court acted contrary to federal law or made

---

[22] Counsel also noted that they were wary of Guthrie's testimony because she might relay inflammatory details such as petitioner's comments that he sawed on the victim's neck and used a crowbar to peel chunks of skin from the victim's neck. State Ct. R., Vol. 14 of 15, Tab G at 239.

an unreasonable determination of the facts in holding that counsel were not ineffective in preparing

the substance abuse experts for trial. As the MAR court concluded, the evidence demonstrates that

Drs. Rohrer and McMillen were adequately prepared and presented the mitigating evidence about

petitioner's substance abuse and blood alcohol level they were retained to present.

Petitioner argues that the experts were not adequately prepared because at trial, cross-

examination of Dr. Rohrer and Dr. McMillen revealed they had not been adequately informed about

the circumstances of the offense and the evidence. Petitioner asserts that Dr. Rohrer's testimony

indicated he was so unfamiliar with the basic facts of the crime that he expressed that the murder

weapons may have been brought to the victim's house to do carpentry. Pet. at 42. Petitioner

contends that because Dr. McMillen had not been given the witness statements of Guthrie, Blake,

or Coleman he was unable to respond to the State's cross-examination about petitioner's statement

that he had not taken any pills the day of the crime, but had only been drinking. Id. at 42-43.

Dr. Rohrer, an expert in social work and substance abuse, was retained to express his expert

opinion that petitioner had a substance abuse problem. State Ct. R., Vol. 14 of 15, Tab G at 30. Dr.

McMillen, a professor of pharmacology and toxicology, was retained to make an estimate of

petitioner's blood alcohol level at the time he committed the crimes based on information about what

petitioner had consumed. Id. at 49-50. Counsel noted that preparation for cross-examination of the

experts was relatively limited because their intended scope of testimony was limited. Further,

counsel explained that they did not give Dr. McMillen petitioner's statement that he had only

consumed two 40 ounce beers because he would not have been in a position to offer useful testimony

based on that information. Id. at 237. Counsel testified that they provided Dr. Rohrer and Dr.

McMillen with the statement petitioner gave to the police. However, counsel explained they

intentionally withheld additional details of the crime to avoid information about petitioner returning

to the crime scene from being elicited during cross-examination. Id. at 186-87, 269-70. Dr. Rohrer testified that in preparing mitigation he generally does not ask about details of the crime because he does not want to be questioned about them while testifying. Id. at 11-12, 22. Dr. McMillen testified that none of his calculations of petitioner's blood alcohol content were questioned at trial. Id. at 61.

Although petitioner disagrees with the state court's determination, the evidence supports the finding that the experts were adequately prepared and that their lack of knowledge as to certain information was not the result of inadequate preparation, but the result of counsel's strategy to obtain the most beneficial testimony from the experts and prevent the State from eliciting damaging facts. The evidence also supports the MAR court's conclusion that Drs. Rohrer and McMillen presented the mitigating evidence about petitioner's substance abuse and blood alcohol level they were retained to present. See MAR Order at 44. Accordingly, petitioner is unable to show the MAR court acted unreasonably in ruling that counsel were not ineffective in their presentation and preparation of the expert testimony at sentencing. Respondent's motion for summary judgment as to Claim VII is granted.

VI.

In the prayer for relief in his petition, Hyde asks the Court to grant him an evidentiary hearing or discovery as may be necessary to resolve the issues presented. Pet. at 44. In his cross-motion for summary judgment, petitioner asserts that respondent has failed to establish he is entitled to summary judgment and "an evidentiary hearing, discovery, expansion of the record, and/or other proceedings are necessary to develop the record and resolve disputed issues of material fact." Cross-Mot. & Resp. at 1.

A federal habeas court must allow an "evidentiary hearing only where a factual dispute, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded the

petitioner a full and fair evidentiary hearing." Rector v. Johnson, 120 F.3d 551, 562-63 (5th Cir. 1997) (internal quotation omitted). Rule 6 of the Rules Governing Section 2254 Cases provides that leave shall be granted to conduct discovery under the Federal Rules of Civil Procedure upon a showing of "good cause" by the petitioner. A petitioner shows "good cause" by presenting specific allegations that if fully developed would entitle him to relief. Bracy v. Gramley, 520 U.S. 899, 908-09 (1997).

Petitioner does not present any details or arguments in support of his requests for an evidentiary hearing and discovery and does not tie his requests to any particular evidence or claims. On this showing, and given the court's treatment of each of the claims above, petitioner has failed to show grounds to support an evidentiary hearing or demonstrate good cause for discovery. Petitioner's requests for an evidentiary hearing and discovery are denied.

VII.

For the reasons stated above, the court finds that Hyde fails to establish he is in custody in violation of the Constitution or laws of the United States. He is not entitled to the relief requested and respondent is entitled to judgment as a matter of law. Accordingly, respondent's motion for summary judgment [D.E. 9] is GRANTED, petitioner's motion for summary judgment [D.E. 14] is DENIED, and the petition for writ of habeas corpus is DISMISSED. It is further ordered that Hyde's requests for an evidentiary hearing and discovery are DENIED.

SO ORDERED. This **2S** day of September 2007.

JAMES C. DEVER III
United States District Judge